NOTICE

Decision filed 07/01/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240583

NO. 5-24-0583

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 20-CF-278 |
| | ) | |
| DARIO N. TRAVIS, | ) | Honorable |
| | ) | Michelle M. Schafer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Cates and Justice Boie* concurred in the judgment.

**OPINION**

¶ 1 Defendant, Dario N. Travis, pled guilty to the offense of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2022)), and the Williamson County circuit court sentenced him to 23 years in prison, followed by 3 years of mandatory supervised release (MSR). Defendant appeals, arguing his sentence is excessive and grossly disparate in comparison to the 11-year sentence received by his codefendant, Demetrius J. Hernandez. For the following reasons, we affirm.

¶ 2 I. BACKGROUND

¶ 3 On June 9, 2020, the State charged defendant by three-count information with attempted murder (count I) (*id.* §§ 8-4(a), 9-1(a)(1)), a Class X felony; armed robbery (count II) (*id.* § 18-

_____

*Justice Moore was originally assigned to the panel. Following Justice Moore's retirement, Justice Boie was substituted on the panel and has read the briefs and listened to oral argument.

2(a)(4)), a Class X felony; and aggravated battery (count III) (*id.* § 12-3.05(e)(1)), a Class X felony, premised on defendant knowingly discharging a firearm causing great bodily harm to the victim, Robert Leeman. The State alleged that defendant performed a substantial step toward the commission of murder in that defendant shot Leeman in the head with a firearm. The State also alleged that defendant took property ($2,500 cash) from Leeman's presence by the use of force, or by threatening the imminent use of force, at which time defendant knowingly caused great bodily harm to Leeman by personally discharging a firearm at the head of Leeman.

¶ 4    The State attached an affidavit for probable cause—dated June 8, 2020, and written by Detective Carl Eggemeyer—wherein Detective Eggemeyer stated that on June 6, 2020, Leeman invited defendant to his residence to purchase cannabis wax. Defendant's cousin and codefendant, Hernandez, accompanied defendant to Leeman's residence. Upon their arrival, defendant and Hernandez followed Leeman and his girlfriend, Haley Popek, to Leeman's northwest bedroom, where Leeman weighed and separated cannabis wax to complete the narcotics sale. According to statements given by Leeman, Popek, and defendant, Hernandez then produced a black semi-automatic handgun with an extended magazine and mounted rail light. Hernandez then closed the bedroom door to keep all of the occupants inside of the bedroom. Leeman and Popek demanded that defendant and Hernandez leave, while defendant attempted to keep Popek from intervening. Hernandez then demanded that Leeman " 'give me all you got.' " Leeman, fearing for his life, attempted to take the handgun from Hernandez, but Hernandez struck Leeman with the weapon. The affidavit went on to state that while striking Leeman with the pistol, Leeman went to the floor. While Leeman was on the floor, Hernandez[1] stole approximately $2,500 in cash from Leeman's

---

[1]Detective Eggemeyer later testified that defendant, not Hernandez, opened and searched Leeman's drawers for money.

2

dresser drawer. Hernandez used his shirt to wipe off the bedroom handle in an attempt to destroy DNA or latent prints left behind. Hernandez then fired his weapon at Leeman, striking Leeman in the front left temporal area of his head. Defendant and Hernandez fled the scene on foot. Shortly thereafter, paramedics transported Leeman via helicopter to Memorial Hospital of Carbondale. Detective Eggemeyer obtained an audio recorded interview with Leeman. At that time, Leeman informed Detective Eggemeyer that defendant and his cousin arrived at Leeman's house to buy drugs. Leeman stated that Hernandez "battered" him, wiped off the bedroom door handle with his shirt, and then shot Leeman in the head before fleeing Leeman's home. The affidavit further indicated that a red blood-like substance was located on clothing in Leeman's closet. There was also a red blood-like substance trailing from Leeman's bedroom to the south entrance door of the residence and then to the driveway of Leeman's residence.

¶ 5    Detective Eggemeyer also indicated that he obtained a recorded statement from Popek, who corroborated Leeman's recollection of events. Popek also "positively identified [defendant] as the suspect who did not produce the firearm." She stated that she yelled at defendant and Hernandez to leave because a child was present in the house. The affidavit further averred that on June 7, 2020, police apprehended defendant and took him into custody, at which time, defendant gave a custodial interview. According to the affidavit, defendant identified Hernandez as his cousin that he brought to the narcotics transaction. Defendant provided written consent to search his cell phone. The phone logs obtained showed numerous calls to and from "Jesse," immediately after the reported time of the shooting. Defendant told Detective Eggemeyer that Jesse was the nickname for Hernandez. Finally, Detective Eggemeyer's affidavit stated that defendant admitted that Hernandez's girlfriend, Lauren," picked up both he and Hernandez following the incident at Leeman's home. This completed the factual information in the Eggemeyer affidavit.

3

¶ 6　　On July 30, 2020, the circuit court held defendant's preliminary hearing and arraignment. The State clarified that it would proceed on count III under the theory of accountability on the charge of aggravated battery. At the hearing, Detective Eggemeyer testified that defendant initiated contact with Leeman to purchase drugs and brought his cousin with him to Leeman's house. Detective Eggemeyer also testified that defendant, not Hernandez, "riffled though [Leeman's] drawer," while Hernandez pointed his gun at Leeman. Detective Eggemeyer indicated that Popek's statement had confirmed that defendant searched Leeman's drawer, and defendant took the money with him when the men fled the scene. Popek also informed Detective Eggemeyer that Leeman did not provoke Hernandez to pull out his gun. Popek provided facts similar to those given by Leeman. Detective Eggemeyer also testified to the discovery of the gun and other items at the defendant's home.

¶ 7　　Following defendant's arrest, Detective Eggemeyer interviewed defendant, who gave a statement to Detective Eggemeyer. Defendant admitted that he arranged for the drug purchase and that he took Hernandez with him. Defendant also informed Detective Eggemeyer that he knew Hernandez had a firearm and also explained that Hernandez had ordered the firearm parts off the Internet and Hernandez had assembled the firearm himself. Eggemeyer offered additional facts from defendant's statement that were consistent with the facts given by the other witnesses, although defendant denied going through the dresser to take money. Following the hearing, the court found probable cause existed to detain defendant on the charges of attempted murder (count I) and aggravated battery (count III). The court did not find probable cause as to count II, the armed robbery allegation. On May 11, 2021, defendant posted bond after the court reduced his bond following a hearing on April 16, 2021.

4

¶ 8     On February 2, 2022, Hernandez, who was 28 years old at the time, entered into a negotiated plea to the offense of aggravated battery with a firearm. Hernandez's defense counsel informed the circuit court that Hernandez was recently sentenced to 10 years on the offense of aggravated driving under the influence (DUI) causing death (Case No. 19-CF-1046) in St. Clair County, Illinois. The parties requested that the court impose a sentence on the offense of aggravated battery with a firearm to run concurrently with the DUI case (Case No. 19-CF-1046). After considering the factual basis and Hernandez's limited criminal history, the court sentenced Hernandez to 11 years in the Illinois Department of Corrections (IDOC), to run concurrently with Hernandez's aggravated DUI conviction and sentence.

¶ 9     Approximately one year later, on February 24, 2023, defendant pled guilty in an open plea to aggravated battery based on the theory of accountability.[2] The circuit court admonished defendant that the offense of aggravated battery carried a possible sentencing range of 6 to 30 years in prison, and defendant stated that he wished to plead guilty. The State then provided a factual basis, wherein the State indicated that Leeman would testify that Hernandez shot him, and the evidence would show that defendant, based on the theory of accountability, participated in Hernandez's shooting of Leeman. Following the State's factual basis, the court accepted defendant's plea of guilty as knowing, voluntary, and intelligent.

¶ 10     On June 8, 2023, the circuit court held defendant's sentencing hearing. From the outset, the State clarified that Hernandez, not defendant, "actually pulled the trigger. *** I just wanted to let the Court know that that's something to consider as well." The court responded that it would

---

[2]In exchange for his guilty plea, the State dismissed the remaining count of attempted murder against defendant in this case and the following pending charges against defendant: (1) unlawful possession of cannabis with intent to deliver, a Class 3 felony (Case No. 19-CF-170); (2) theft, a Class 3 felony (Case No. 19-CF-304); (3) mob action, a Class 4 felony (Case No. 19-CF-377); (4) retail theft, a Class 3 felony (Case No. 21-CF-559); (5) criminal damage to property, a Class 4 felony (Case No. 23-CF-78); and (6) two unidentified traffic infractions (19-TR-4957; 20-TR-2518).

consider that information. Defense counsel then followed up by introducing several exhibits. The first two were the charge against Hernandez, with Detective Eggemeyer's affidavit attached, and the plea of guilty by Hernandez. Defense counsel asked to have these incorporated into defendant's presentence investigation (PSI). Defense counsel argued these were relevant, as the affidavit of probable cause written by Detective Eggemeyer was the same affidavit for both defendant and Hernandez. Defense counsel further stated that, although Hernandez and defendant were not technically codefendants, the same judge in defendant's case had sentenced Hernandez. The court allowed these two exhibits to be incorporated into the PSI. Defense counsel also requested that the court consider Hernandez's sentencing order, as well as the "Official Statement of State's Attorney and Trial Judge."

¶ 11    The State responded to the last two exhibits, arguing that Hernandez's judgment and sentence were irrelevant. The circuit court agreed with the State. Defense counsel responded that "when [he] looked up this case *** on Judici, it indicates that it was Your Honor who took the plea for Demetrius Hernandez." The circuit court stated that it would examine the Hernandez case. The following colloquy took place:

"[DEFENSE COUNSEL]: *** [W]e would just argue respectfully that we believe it is relevant to the sentence in this case because it's the exact same incident, it's the exact same charge, it's the exact same crime. It's *** the same incident with the same victim. It's the same act. And so our argument would be that, of course, it would be relevant. It's *** the exact same act with the same victim. [Defendant] is charged and pled guilty under a theory of accountability, but it's actually the actions of Demetrius Hernandez, although he's legally responsible for those actions, that it would be relevant. It's hard to imagine something that could be more relevant.

6

* * *

THE COURT: What I don't know as I sit here at this point, without examining the Hernandez case in more detail, is whether it was a negotiated sentence, whether it was a sentence that was imposed strictly from a hearing as we're having today, or whether there was some bargain, *per se*, involved in what that sentence was. That's my concern.

[THE STATE]: I can answer that question. It was the result of a negotiation. That was not an open plea [in Hernandez's case].

THE COURT: So I think that sheds a different light on it, if you will. I understand the circumstances arise out of the same incident, but knowing there was some form of negotiation that took place—obviously, I've heard how many years. You've told me, you know. The bell's rung. But I still don't see that that is admissible as part of this record given that it was a negotiated sentence."

The court indicated that it would examine the probable cause affidavit written by Detective Eggemeyer with the understanding that defendant pled guilty under a theory of accountability.

¶ 12    Following argument by the parties, the State called Detective Eggemeyer to testify. Detective Eggemeyer testified consistently with his probable cause affidavit and his prior testimony at defendant's preliminary hearing. Detective Eggemeyer also testified that Leeman attempted to take the firearm from Hernandez and exit his bedroom. Leeman's attempts failed, and Hernandez struck Leeman in the head with the gun multiple times. Before defendant and Hernandez left the bedroom, Hernandez wiped off the bedroom door handle with his shirt and fired a shot at Leeman, striking Leeman in the head. Defendant and Hernandez left Leeman's home and fled to a nearby town. Defendant did not stop to render aid to Leeman. Detective Eggemeyer also testified that Leeman underwent extensive brain or head surgery following the shooting.

7

¶ 13    The State requested, without objection by defense counsel, that the circuit court take judicial notice of a plenary order of protection entered against defendant by Colbie Ridgway, the mother of defendant's oldest children (Case No. 23-OP-124). The State also requested to introduce, without objection, a photograph of Leeman's head following surgery. The State also informed the court that Leeman wished to read his victim impact statement before the court and that this statement was different than the statement attached to defendant's PSI. Defense counsel objected, requesting that the court not allow Leeman two victim impact statements. The court noted on the record that it would allow Leeman to "say whatever he needs to on the record" but would not admit his additional statement into evidence. The court then deferred the reading of the victim impact statement and allowed defense counsel to call a witness.

¶ 14    Defense counsel then called Esperanza Rodgers, defendant's mother, to testify in mitigation. Rodgers testified that defendant's father had been absent his entire life. Rodgers testified that defendant changed his life after posting bond in the instant case, as evidenced by defendant obtaining employment, renting an apartment, purchasing a vehicle, and caring for his children. Defendant had two children, an 11-month-old daughter and an 8-month-old son from two women, as well as expecting a third child, a son, in September 2023, with another woman whom defendant dated. Rodgers testified that defendant lived with his daughter for the first six months of her life. Following the filing of the order of protection by Ridgway, defendant's daughter's mother, defendant saw his daughter only every other weekend. Rodgers testified that defendant provided financial support for his daughter; however, she indicated that no formal child support or visitation orders existed because "[t]here was no need," provided defendant and Ridgway co-parented well together. Although the PSI indicated that defendant did not pay child support, Rodgers stated that defendant was not court ordered to do so. Rodgers also testified that defendant

8

had a relationship with his infant son "as much as [the] mom w[ould] allow." Rodgers clarified that defendant's son's mother did not allow defendant to see his son. Despite this, Rodgers confirmed that defendant did not petition the court to set up visitation with his son. Rodgers testified that defendant's absence would impact his three minor children.

¶ 15    Rodgers also testified that defendant looked up to his older cousin, Hernandez, stating that defendant "wanted to be a lot like" Hernandez and "used to emulate him 'cause [*sic*] he was so much older and *** cooler ***." Rodgers believed Hernandez had much influence over defendant, given Hernandez was older than defendant, and defendant viewed him like an older brother. On cross-examination, Rodgers confirmed that defendant had supervised visits with his infant daughter as a result of the order of protection. No additional witnesses were called by the defendant.

¶ 16    Leeman next offered his victim impact statement. Leeman stated that his life since the shooting incident had been "nothing short of an absolute nightmare." Leeman indicated that he felt disconnected since the incident, sharing that he could not "trust anyone anymore," including defendant, who he called a friend before the incident. He stated that he suffered from post-traumatic stress disorder (PTSD), anxiety, depression, and dissociation following the shooting. Referring to defendant as a "sociopath," Leeman stated his belief that defendant "preyed on [him] because, evidently, [he] was an easy target, one that never had [his] guard up, so [he] was chosen." Leeman stated that defendant knew Leeman recently sold a truck and did not have a weapon at his house. Leeman continued to state the following:

> "Immediately, upon entering my bedroom, [defendant] and his cousin began telling
> me that I will be killed if I don't cooperate and to give them everything that I have. He
> pointed the gun at my girlfriend and said that he would kill her, too. I knew that there were

9

other people in the house, which at the time consisted of my mom, my nephew, and my mom's boyfriend. *** I didn't know if he knew that, though, so I froze with fear. I had never expected or experienced anything like that. I immediately went into shock. I gave them the money, but that didn't make them stop or leave. There was never a moment when they were threatening me where I thought that I would live. *** They kept pistol-whipping me while telling me to get ready for the trigger pull. I could tell that they were getting off to it. They love it because they felt so powerful. Eventually ***, [defendant's] cousin[,] Demetrius had the gun—held the gun to my head and pulled the trigger about two inches from my temple. I was on the floor on my knees, completely helpless, begging for my life. I wasn't reaching for the gun. I was trying to protect myself. They ran out of the house while I convulsed, seized, and began bleeding out. They got into a getaway vehicle that was parked a couple blocks away and was captured on my neighbors' cameras."

Leeman also stated that "while [he] was in the ICU fighting for [his] life," defendant was seen at a paintball field with pockets full of Leeman's "hard-earned cash." Leeman stated that he suffered from "immeasurable" paranoia and terror following the incident and that defendant, while on bond, downplayed the situation to people, calling Leeman "crazy." Leeman stated that he endured a 13-hour brain operation to insert a titanium plate to replace one-fifth of his skull. As a result of extensive medical procedures, he incurred substantial medical debt.

¶ 17    Following Leeman's victim impact statement, the State acknowledged that defendant did not pull the trigger; however, the State asserted that defendant brought Hernandez with him to Leeman's house. The State argued that Hernandez would not have been at Leeman's house if not for defendant's actions. The State continued to argue that Leeman trusted defendant and the two men were friends prior to the incident at issue. The State, arguing that defendant had a low potential

for rehabilitation, asserted that defendant was a juvenile offender and, while on bond in the instant case, "ha[d] gotten three different women pregnant" and "ha[d]n't managed to stay completely out of trouble, has had some run-ins." The State requested the circuit court sentence defendant to 30 years in prison.

¶ 18    In response, defense counsel argued several statutory factors in mitigation, including that defendant's criminal conduct was induced or facilitated by someone other than defendant. Defense counsel argued that defendant was less culpable than Hernandez "because [defendant] is not the person who pulled the trigger." Defense counsel argued that no evidence showed defendant knew Hernandez had a gun when defendant took Hernandez with him to purchase drugs. Defense counsel next argued that defendant's criminal conduct was the result of circumstances unlikely to reoccur. In support, defense counsel highlighted that defendant spent 337 days in custody before he posted bond. Once released, he worked full-time, took care of his two infant children, and was expecting the birth of his third child. Defense counsel argued that defendant, who was 20 years old at the time of the incident, had a different attitude now, as demonstrated by Rodgers's testimony. In highlighting that the law with respect to young adults was evolving, defense counsel requested the court consider defendant's age at the time of the shooting, stating defendant was "an immature 20-year-old." Moreover, defense counsel argued that Rodgers's testimony demonstrated that defendant looked up to his older cousin.

¶ 19    Next, defense counsel acknowledged that defendant "had some incidents" since the instant offense, including criminal damage to property and an order of protection against him. However, according to defense counsel, defendant's criminal history did not include violent crimes or show "incorrigibility or depravity." Defense counsel requested that the circuit court consider defendant's actions after police arrested him, including that defendant identified Hernandez as his cousin, gave

11

police permission to search his phone, and identified calls in his phone log between he and Hernandez. Defense counsel also argued that defendant's willingness to speak with police and identify Hernandez following the shooting indicated that defendant was unlikely to commit another crime. Defense counsel requested the circuit court sentence defendant to six years in prison.

¶ 20    Following defense counsel's argument, defendant offered a statement in allocution. Defendant stated that he was not a violent person and wished to go home to see his children. Defendant also stated that he took responsibility for his actions, indicating that "[he] could have provided some type of aid to [Leeman] ***, and [he] didn't because [he] was scared and [he] didn't want to get anybody in trouble, like as far as my family."

¶ 21    Prior to imposing defendant's sentence, the circuit court indicated that it considered the factors in aggravation and mitigation, the recent 2023 plenary order of protection against defendant, witness testimony, Leeman's victim impact statement provided in open court, defendant's statement in allocution, and the PSI report. The court noted that defendant had committed the offense of residential burglary when he was 16 years old. Initially, a court granted defendant probation; however, he was transferred to a juvenile correctional facility in Indiana at the age of 17 for approximately 9 months following the revocation of his probation for "some type of theft."[3] The court then stated that defendant committed the offense at issue roughly a year and a half after his release from the juvenile correctional facility in Indiana.

¶ 22    Next, the circuit court found it "relevant and concerning" that defendant grew up without a father himself. The court indicated that the findings in the plenary order of protection did not

---

[3]The circuit court noted that defendant's probation was transferred to Indiana following Rodgers's move to Indiana.

support Rodgers's testimony that defendant had changed his life since posting bond. Rather, the court noted that the findings set forth in the order of protection paints a picture of someone who is hostile "when he doesn't get his way." The court read several allegations contained in the order of protection, including that defendant threatened Ridgway's grandparents and family members, and defendant placed Ridgway's clothes in a toilet when she did not leave the home quickly enough. The court expressed its concern regarding the allegations against defendant. As it related to defendant's children and his role as a father, the court, again, referenced the order of protection, stating that defendant, on several instances, "attempt[ed] to take the child away, take the phone from the mother so that she cannot find his whereabouts." Although the court expressed devastation that defendant's children would lack a father figure, the court expressed serious concerns whether defendant could be a positive role model for his children. The court also stated that it did not believe defendant's actions were induced by Hernandez. Rather, the court found it important that defendant initiated contact with Leeman to purchase cannabis.

¶ 23    With regard to the factors in aggravation, the circuit court found that defendant's conduct caused serious harm to Leeman and that defendant had a history of prior delinquency both as a juvenile and then a year and half later as an adult in the instant case. The court stated that the "evidence prior to this incident, this incident, and most recently with this order of protection do not paint th[e] picture" of a man who is "going to do better [and] trying to do better." As such, the court indicated that the imposition of a sentence necessary to deter others was needed. The court acknowledged that defendant "may have been an immature 20-year-old." However, the court "struggle[d] *** read[ing] the 100-page" PSI "to find that as a child *** his mother [tried] to get him the treatment he needed. There was a cry for help several times from the age of 11." The court also stated that it did not take the plea in Hernandez's case and did not consider any information,

13

evidence, or criminal history as to why Hernandez was offered a negotiated plea. The court subsequently sentenced defendant to 23 years in IDOC, to be served at 85%, followed by 3 years of MSR.

¶ 24    On July 7, 2023, defendant filed a motion to reconsider sentence. Defendant argued that his 23-year prison sentence was arbitrarily and unreasonably disparate to Hernandez's 11-year prison sentence. Defendant argued that Hernandez was the principal actor, was more culpable than defendant for Leeman's injuries, and had a more significant criminal history than defendant, including causing the death of another in an aggravated DUI offense. Defendant argued that it was shocking that "the gunman, the person who pulled the trigger and shot Robert Leeman in the head, will serve less than half the amount of time that [defendant] must serve under his sentence." Next, defendant argued that the circuit court acted in error when it stated on the record at defendant's sentencing hearing that it did not take Hernandez's negotiated plea. In support of his argument, defendant attached the transcript of Hernandez's February 2, 2022, negotiated plea hearing and argued that the same judge had presided over Hernandez's plea. Defendant also argued that the court failed to properly consider and give weight to the factors in mitigation, while improperly considering or giving undue weight to the factors in aggravation. Lastly, defendant asserted that he realized, after his sentencing hearing, that he committed a theft of an iPhone that belonged to the son of the judge in the circuit court who was imposing the sentence. According to the defendant, this incident occurred when the defendant was in the eighth grade. As such, he alleged that the judge was biased against, or had a conflict of interest with, defendant, which influenced her imposition of defendant's sentence.

¶ 25    On July 12, 2023, defendant filed a motion for substitution of judge. Defendant asserted therein that he was caught and suspended from eighth grade after he stole the iPhone that belonged

14

to the judge's son. Defendant attached an affidavit attesting to the theft incident several years before.

¶ 26　On July 17, 2023, the judge in the circuit court filed an affidavit attesting that, following defendant's motion to reconsider sentence and for substitution of judge, which alleged defendant's theft of the cell phone that belonged to the judge's son that allegedly occurred when defendant was in the eighth grade, the judge questioned her husband and son and neither individual recalled the alleged event. The affidavit averred that the cell phone at issue went missing while the judge's son was at a summer basketball practice years before. The judge further stated, however, that the basketball coach notified the dean of students at Marion High School and the cell phone was returned the next day. "All details regarding where the phone was located or who had the phone were not disclosed to our family." The judge went on to state that defendant's PSI indicated that he attended Herrin High School and the Learning Center in Marion, Illinois, which did not lead the judge to conclude that defendant attended Marion Unit 2 School District. The judge's affidavit further attested that, "[p]rior to assignment of this case, I ha[d] no memory or recollection of the Defendant. I had never seen him before, and I had no knowledge that he may have stolen my son's cell phone."

¶ 27　On August 9, 2023, defendant's case was reassigned to a different judge for a hearing on defendant's motion for substitution of judge. Shortly thereafter, on August 29, 2023, a hearing was held on defendant's motion, wherein defense counsel made extensive argument consistent with defendant's motion. Following argument by the parties, the judge assigned to hear the defendant's motion denied defendant's motion for substitution of judge.

¶ 28　On February 7, 2024, defendant filed a memorandum of law in support of his motion to reconsider sentence. Defendant, again, argued that his 23-year prison sentence was arbitrarily and

15

unreasonably disparate to the 11-year sentence received by Hernandez. Defendant contended that the disparity in sentences was not justified by the difference in pleas entered by defendant and Hernandez, given that Hernandez was more culpable and had a more serious criminal history.

¶ 29 On February 27, 2024, the State filed an objection to defendant's motion to reconsider sentence. The State asserted that, although Hernandez shot Leeman, "the case against [Hernandez] was not as strong because it would have required the testimony of this defendant to prove the identity of the co-defendant at trial." In asserting defendant was not similarly situated to Hernandez, the State argued the following:

"7. Mr. Leeman was not going to be able to testify at the scheduled trial against Mr. Hernandez because of post-traumatic stress related to this incident.

8. Other witnesses against Mr. Hernandez weren't located prior to his scheduled trial.

9. After consultation with Mr. Leeman's mother, the State decided that something was better than nothing and agreed to the 11 year sentence.

10. The case against this defendant was a much stronger case because there were no identity issues, the defendant had provided a statement to law enforcement and Mr. Leeman was in better mental health.

11. The defendant was the one who set up the cannabis deal, was aware that Mr. Leeman had cash on hand and knew where Mr. Leeman kept the cash.

12. The defendant was the only one of the two who were acquainted with Mr. Leeman, and he brought Mr. Hernandez to Mr. Leeman's house.

13. The defendant was not similarly situated to codefendant Hernandez because Hernandez entered a fully negotiated plea.

16

14. Furthermore, the defendant was also charged in five different felony cases, one of which also involved violence against another.

15. The Order of Protection entered against the defendant also indicated violent tendencies.

16. Mr. Hernandez had no history of violent crime."

¶ 30 On April 23, 2024, the circuit court held a hearing on defendant's motion to reconsider. Following argument by the parties, the circuit court judge clarified on the record that she "did take [Hernandez's] negotiated plea." The judge further stated that the only factual information that the court heard related to Hernandez's case was the State's factual basis, which essentially entailed the reading of the information. The court noted that the State offered no additional evidence or facts during Hernandez's negotiated plea. The court further continued to state the following:

"Upon reading of the transcript, which is the only thing I know to be certain, there was nothing to any effect in relation to *** whether someone else shot the gun. It simply said that—and I believe that that is part of the allegation. I'm not saying it's not. But they both pled guilty to the same offense. ***

I then learned in [defendant's] sentencing hearing that it was under the Theory of Accountability. And that's when [defense counsel] wanted me to take into consideration the negotiated sentence of 11 years that the Defendant Hernandez was given based upon whatever their negotiation was.

And as you know, [defense counsel], and as [the State] knows, the court knows just a tiny piece of why it's being presented. And absent something that is so egregious, something that does not comport with the facts that you are given, only then you can say, Stop right here, I'm not going to accept it. And that happens. It does. But that did not happen in Mr. Hernandez's situation.

17

***

"\*\*\* But where does an open plea lie in relation to its similarities to a trial when the Defendant then has to be sentenced by someone, or a negotiated plea when it's completely arranged between both sides and the judge has to decide if it's approved? Those standards are much different. What you apply, what you consider are much different.

\*\*\* Things that I have taken from the transcripts and my notes from the original sentencing hearing, I will share."

The court then highlighted that Detective Eggemeyer testified that defendant and Leeman were friends and that defendant initiated contact to purchase cannabis wax from Leeman. Defendant then brought Hernandez with him to Leeman's home. Once they arrived, defendant and Hernandez entered Leeman's bedroom, shut the door, and brandished a gun. Defendant then started to go through Leeman's drawers for money, which he found and took into his possession. Hernandez then attempted to wipe the bedroom door handle with his shirt before firing a shot at Leeman's head. The court continued to state:

"There is no evidence that [defendant] knew or didn't know [Hernandez had a gun]. From the circumstances of the facts that are laid in place, it would seem circumstantially that he did know, but there is no evidence of that. I'm not the trier of fact. But I do have to consider the culpability. Are they similarly situated individuals?"

Although the court recognized that Hernandez was older than defendant, and defendant looked up to Hernandez, the court noted that both Hernandez and defendant ran out of Leeman's house "with the money in Defendant's pocket. There was no aid called. There was [*sic*] no warnings given to anyone." Instead, Leeman "was left alone." The court also took judicial notice of the recent plenary order of protection (23-OP-124) against defendant. The court noted that defendant had three

18

children over the course of 18 months while on bond. Next, the court stated that defendant's juvenile criminal history included a conviction for residential burglary when defendant was 16 years old. A circuit court placed defendant on probation for this offense but revoked probation due to a subsequent theft offense and placed defendant in a juvenile correctional facility in Indiana. The court noted that it had considered this conviction only in the sense that defendant committed the instant offense 18 months after his release from the juvenile correctional facility.

¶ 31 The circuit court acknowledged that Hernandez shot Leeman. However, in terms of culpability, the court stated that defendant "was instrumental in initiating the contact with the victim." The court continued to state that defendant and Leeman were friends and defendant "knew Leeman engaged in some type of drug sales perhaps that created money in his pocket." The court also noted that Leeman and Popek informed Detective Eggemeyer "as soon as they shut the door[,] *** the gun was out," and Leeman was instructed to " '[g]ive us all you have got.' " Based on the fact that defendant knew Leeman and initiated the contact, the court did not believe defendant and Hernandez were similarly situated.

¶ 32 With regard to defendant's argument concerning the disparity in sentences, the circuit court noted that the parties did not present argument as to Hernandez's character, personal history, or capacity for rehabilitation, and the court did not hear any detailed facts relating to culpability. The court noted that it "s[aw] the disparity in the sentences that were rendered. I made a decision on one. I accepted the negotiated plea on the other." The court stated that it viewed a negotiated plea and an open plea differently, reasoning that imposing a sentence following an open plea, which requires an obligation for a PSI, witnesses, and the victim to relive the case, "is more likened to a trial than another negotiated plea." In making a comparison between the obligations placed on attorneys and the court for an open plea and a sentence imposed after trial, the court stated that

19

"[t]he same things have to be reopened. The evidence, the facts, the victim." The court continued to state:

"For those reasons, this court finds that it's not the disparity of the sentence that is the only element here. *** This court believes it would be improper, as it initially stated in the sentencing hearing, to consider and to apply the negotiated sentence of Mr. Hernandez to this situation without having some basis in fact to do so."

After discussing defendant's culpability and considering defendant's criminal history, the victim impact statement, and defendant's PSI, as well as the witness testimony at defendant's sentencing hearing, the court denied defendant's motion to reconsider sentence. This appeal followed.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, defendant argues first that the circuit court's imposition of defendant's 23-year sentence was grossly disparate to Hernandez's 11-year sentence, in violation of principles of fundamental fairness. Defendant contends that he and Hernandez were similarly situated, as both men pled guilty to the same offense for the same crime against the same victim. According to defendant, the "only difference between their pleas was that Hernandez's plea was negotiated while [defendant's] plea was open." The State responds, arguing that defendant and Hernandez were not similarly situated, as the nature of the plea agreements differed and the court knew far more extensive information concerning defendant's character, potential for rehabilitation, and criminal history.

¶ 35    The circuit court has broad discretionary powers in imposing a sentence, and its sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible. *People v. Taylor*, 318 Ill. App. 3d 464, 477 (2000). Fundamental fairness, however,

20

is not violated simply because one defendant is sentenced to a greater term than another. *People v. McCann*, 348 Ill. App. 3d 328, 339 (2004). While defendants similarly situated should not receive grossly disparate sentences, equal sentences are not required for all participants of the same crime. *People v. Spriggle*, 358 Ill. App. 3d 447, 455 (2005). The difference may be justified by the relative character and history of the codefendants, the degree of culpability, the rehabilitative potential, or a more serious criminal record. *People v. Grisset*, 288 Ill. App. 3d 620, 634 (1997). "It is not the disparity that controls, but the reason for the disparity." *Spriggle*, 358 Ill. App. 3d at 455. This court may not substitute our judgment for that of the circuit court merely because we would have weighed such factors as credibility, demeanor, general moral character, mentality, social environment, habits, and age, differently. *Stacey*, 193 Ill. 2d at 209.

¶ 36 Here, the circuit court sentenced defendant following an open plea agreement, resulting in a 23-year sentence. Defendant maintains that because he was less culpable, had a less serious criminal background, and had higher potential for rehabilitation than Hernandez, the disparity in sentencing is not justified, especially given defendant and Hernandez were similarly situated and "no legal distinctions between an open and negotiated plea" exist.

¶ 37 Defendant is correct that no court has addressed the precise issue before this court concerning whether a sentence imposed following an open plea of guilty may be validly compared to a sentence imposed under a fully negotiated plea of guilty. In support of his argument that the difference in plea type in the instant case does not justify the sentencing disparity, defendant contends that "both open and negotiated pleas afford the State the same functional benefits and have the same operable effects." In order to respond to defendant's arguments, we begin our analysis with an examination of the difference between an open plea and a fully negotiated plea. Plea agreements in Illinois are governed, at least to some extent, by contract law principles. *People*

21

*v. Evans*, 174 Ill. 2d 320, 326 (1996). Our courts have recognized that a negotiated plea is different from an open plea. *Id.* at 325. In an open plea, both the defendant and the State are free to argue for any sentence permitted by statute. *People v. Lumzy*, 191 Ill. 2d 182, 185 (2000). The circuit court then exercises full discretion to determine and impose the defendant's sentence. *Id.* Thus, the court retains all of its discretion at sentencing. *Id.*

¶ 38　　Conversely, when a defendant enters into a negotiated plea, the defendant agrees to plead guilty in exchange for a specific sentencing recommendation by the State. *Id.* Although the sentencing court is allowed to determine whether it will accept the terms of the negotiation, once the circuit court accepts the plea agreement negotiated by the parties, it enters judgment thereon. *Id.* at 185-86. Thus, under a negotiated plea, unlike an open plea, "the guilty plea and the sentence 'go hand in hand' as material elements of the plea bargain." *Evans*, 174 Ill. 2d at 332. Accordingly, because a negotiated plea "limits or forecloses the State from arguing" for the full sentencing range, which ultimately constrains the State to the parameters of the agreement (*People v. Diaz*, 192 Ill. 2d 211, 222, 225 (2000)), the sentencing proceeding does not require the same full adversarial development of factors in aggravation and mitigation that occurs following an open plea.

¶ 39　　Importantly, here, what transpired in the instant case highlights a fundamental difference between open and negotiated plea agreements. A transcript from Hernandez's negotiated plea and sentencing hearing demonstrates the information, albeit limited, that the circuit court had available when sentencing Hernandez. Specifically, the court heard the State's factual basis for the negotiated plea, which stated that Hernandez shot Leeman in the head, causing great bodily harm to Leeman. The State did not provide factual details surrounding the aggravated battery, the involvement of a codefendant, or additional evidence concerning culpability. The State also

22

informed the court that Hernandez's "only significant criminal history" included a 10-year sentence Hernandez was currently serving for the 2019 offense of aggravated DUI causing death committed when he was 27 years old. The court did not hear additional evidence before accepting the plea and did not have the benefit of a PSI, as both the State and defense counsel waived this requirement. The court had no information concerning Hernandez's social or personal histories, his character, his rehabilitative potential, or whether, like defendant, Hernandez had a history of noncompliance with probation. Thus, by the nature of the negotiated plea, the circuit court possessed very limited information at the time it accepted the State and defense counsel's 11-year sentence recommendation for Hernandez.

¶ 40    Dissimilar to Hernandez's plea and sentencing hearing, the circuit court in defendant's case heard the presentation of evidence and witness testimony, arguments in aggravation and mitigation presented by the parties, and Leeman's victim impact statement. The court also had access to defendant's lengthy 100-page PSI, which included defendant's juvenile and adult criminal record. In addition, the court was also made aware that defendant had a pending charge for criminal damage to property committed while on bond, as well as an order of protection filed against defendant while on bond. The court also had knowledge of Leeman's psychological and physical states, as provided in his victim impact statement. Thus, unlike in Hernandez's case, where the court knew virtually nothing about Hernandez or Leeman at the time of sentencing, the court, here, had a robust understanding of defendant; defendant's social, personal, and criminal histories; detailed factual evidence surrounding the incident at issue; and defendant's conduct while on bond following the shooting the incident.

¶ 41    Accordingly, based on the fundamental differences as to the quality and quantity of the information available to the sentencing court in open versus negotiated plea agreements as stated

23

in detail above, this court is unable to compare this defendant's sentencing following an open plea to Hernandez's sentence following a fully negotiated plea. Thus, we cannot conclude that defendant's sentence was disproportionate to Hernandez's sentence.

¶ 42 Moreover, again, while no court has addressed the precise issue before this court, both parties cite *People v. Anderson*, 2021 IL App (2d) 191001, ¶ 22, which we find instructive. In *Anderson*, the defendant argued that his 18-year sentence was disproportionate to the 14-year sentences his codefendants received for the same crime. *Id.* The defendant's codefendants entered into a fully negotiated plea to armed robbery and each received a 14-year sentence. *Id.* ¶ 3. The defendant, however, rejected two negotiated plea deals offered by the State before he eventually entered into an open plea for armed robbery with the removal of the 15-year firearm enhancement. *Id.* ¶ 4. The circuit court ultimately imposed an 18-year sentence on the defendant. *Id.* ¶ 19. On appeal, our colleagues in the Second District Appellate Court rejected the defendant's insistence to compare a sentence imposed following an open plea of guilty to a sentence imposed under a fully negotiated plea. *Id.* ¶ 28. In declining the defendant's request, the appellate court reasoned that "[a] defendant who contends that his sentence is unfairly disparate to that of a codefendant has the burden to produce a record sufficient to support the claim." *Id.* Without a record that contained the codefendants' criminal, social, family, school, and employment histories—and the information that the circuit court had available when sentencing the codefendants, including the factual bases or whether evidence was heard from other sources—the appellate court concluded that it lacked the ability to meaningfully compare the defendant's sentence to his codefendants. *Id.* Thus, because the record lacked "sufficiently detailed information about the codefendants," the appellate court could not "say that [the] defendant's sentence was disproportionate to [his codefendants] even if the[ ] [codefendant's] fully negotiated pleas offer a valid basis of

24

comparison." *Id.* ¶ 31. Thus, although the appellate court decided not to address the disparity in sentencing issue, the court determined that meaningful comparison of the sentences of the defendant and his codefendants was not possible without a complete picture of the information available to the trial court at the time the court sentenced the codefendants. *Id.* ¶¶ 29, 31.

¶ 43 Although defendant presented the State's three-count information against Hernandez, the affidavit of probable cause, and a leads entry specifying Hernandez as a wanted person, Hernandez's guilty plea and accompanying transcript, his judgment and sentencing order, and the "Official Statement of State's Attorney and Trial Judge," detailed information about Hernandez to meaningfully compare defendant's sentence to Hernandez's sentence is lacking. Again, we must reiterate that even with the information defendant provided this court, no information concerning Hernandez's social or personal histories, his character, rehabilitative potential, or whether, like defendant, Hernandez had a history of noncompliance with probation is known. Accordingly, similar to *Anderson*, a comparison of the information available in the record reveals that there is insufficient detailed information about Hernandez to meaningfully compare defendant's sentence to Hernandez's sentence.

¶ 44 Next, defendant argues that his 23-year sentence was excessive. In support of this argument, defendant maintains that the circuit court failed to weigh the mitigating factors properly. Specifically, defendant contends that the court failed to meaningfully consider in mitigation that defendant (1) was 20 years old at the time of the offense, (2) had a nonviolent juvenile record, (3) had a high rehabilitative potential, and (4) was heavily influenced by Hernandez. Defendant further contends that Hernandez, not defendant, induced or facilitated the offense against Leeman and that the court improperly relied on his juvenile adjudications and the order of protection to justify his disproportionately high sentence, as well as improperly "turn[ing] the mitigating factor

25

of [defendant's] parentage to young children into an aggravating factor." We address defendant's contentions in turn.

¶ 45 The trial court is afforded substantial deference in imposing a sentence (*People v. Alexander*, 239 Ill. 2d 205, 212 (2010)) because the trial court is in the best position to consider "defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Stacey*, 193 Ill. 2d at 209. It is not the function of a reviewing court to reweigh the aggravating and mitigating factors in considering the propriety of a sentence, and a reviewing court should not "substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Id.*

¶ 46 When a sentence falls within statutory limits, it is presumed proper. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28. A defendant may rebut the presumption by demonstrating that the sentence imposed "greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Id.* The trial court must consider all relevant factors in mitigation and aggravation in determining a sentence and must "balance the retributive and rehabilitative purposes of the punishment." (Internal quotation marks omitted.) *People v. Weiser*, 2013 IL App (5th) 120055, ¶¶ 31-32. We presume the trial court considered all the relevant factors in imposing its sentence. *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 38 (citing *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48).

¶ 47 We employ an abuse-of-discretion standard of review when considering the propriety of a trial court's sentence. *Id.* ¶ 39. An abuse of discretion occurs only when the imposed sentence differs greatly from the spirit and purpose of the law or the sentence is manifestly disproportionate to the nature of the offense. *People v. Snyder*, 2011 IL 111382, ¶ 36.

¶ 48    Here, the circuit court sentenced defendant to 23 years in prison for aggravated battery, a Class X felony with a sentencing range between 6 and 30 years in prison. 730 ILCS 5/5-4.5-25 (West 2022). Accordingly, we presume the court's sentence was proper.

¶ 49    The record reveals that the circuit court thoroughly reviewed all evidence presented at the hearing, as well as the factors in aggravation and mitigation. The circuit court found that defendant's status as a young father was a mitigating factor, and the court also considered the fact that defendant, himself, did not grow up with a father. Defendant argues on appeal that the court improperly turned the statutory mitigating factor of his role as a father to young children into an aggravating factor. A review of the sentencing hearing, however, does not support defendant's contention. The circuit court could not ignore the fact that defendant had very limited interaction with his two minor children. Specifically, defendant saw his one-year old infant daughter every other weekend for supervised visits, due to a two-year plenary order filed in March 2023, and defendant was not allowed to see his eight-month old infant son, as evidenced by Rodgers's testimony that defendant's son's mother did not allow visitation with defendant. The details explaining why the mother forbids visitation are not known; however, the court heard from defendant's own mother that defendant did not have contact with his infant son.

¶ 50    The State requested that the circuit court take judicial notice of the two-year plenary order of protection filed by the mother of the defendant's daughter in March 2023, while defendant was on bond in the instant case. Defense counsel did not object. Defendant argues on appeal that the court relied too heavily on the order of protection to justify his disproportionate sentence. Generally, a sentencing court may consider evidence of conduct for which no prosecution or conviction ensued, provided that evidence is both relevant and reliable. *People v. Gomez*, 247 Ill. App. 3d 68, 74 (1993). The record here supports a finding that the court found the order of

protection, given the timing of the allegations against defendant while on bond, both relevant and reliable, especially where defense counsel presented Rodgers's testimony in mitigation that defendant had significantly changed his life since the incident with Leeman. The court, recognizing defendant was a father to two infant children with a third child on the way, highlighted that the recent order of protection failed to support Rodgers's testimony concerning defendant's character and rehabilitation. Moreover, Rodgers, herself, testified about the order of protection and the changes in visitation defendant experienced as a result. In addressing the order of protection, the court expressed concern that the order of protection and the court's findings concerning the allegations contained within did not paint the picture of a man who was "going to do better [and] trying to do better." As such, in considering defendant's rehabilitative potential, the court expressed concern that defendant could not "control [his] temper or *** engage in meaningful conversation," especially since the order was filed and granted while defendant was on bond in the instant case. We find that the circuit court properly considered this information in sentencing the defendant.

¶ 51    Next, contrary to defendant's argument on appeal that the circuit court heavily relied on defendant's history of juvenile adjudications and "disregarded [defendant's] young age," the record demonstrates that the circuit court did in fact consider defendant's age. We first note that defendant cites multiple research articles concerning emerging adult brain science to support his argument that the court improperly dismissed and failed to consider that his brain was not fully matured and that juveniles lack maturity, which can often lead to impulsiveness in emotionally charged situations. Defendant, however, presents this argument and materials to this court for the first time on appeal. As such, we decline to consider this on appeal. *People v. Dillard*, 2025 IL App (4th) 230739, ¶ 166.

28

¶ 52    We note that, although the circuit court recognized that defendant may have been an immature 20-year-old at the time of the offense, the court found it important that a pattern of criminality started when defendant was 16 years old and that defendant continued to exhibit poor decision-making as an adult while on bond in the instant case. In reviewing defendant's 100-page PSI, the court noted that a prior court revoked defendant's probation for residential burglary when defendant was 17, which led to a 9-month sentence in a juvenile correctional facility. Moreover, the court found it important that approximately 18 months after his release from the juvenile correctional facility, defendant committed the instant offense against Leeman, an individual defendant knew for some time. Importantly, at the hearing on defendant's motion to reconsider sentence, the court clarified that it did not consider the residential burglary conviction "as his criminal history, but as a timeline in relation to being released" from the juvenile correctional facility and committing the instant offense against Leeman. Furthermore, evidence presented by the State and contained in the PSI demonstrated that the State filed pending charges against defendant for criminal damage to property while defendant was on bond in the instant case and that the State agreed, as part of the open plea agreement, to dismiss four additional felony charges against defendant that took place prior to the 2020 shooting of Leeman: (1) a 2019 unlawful possession of cannabis with intent to deliver charge; (2) a 2019 theft charge; (3) a 2019 mob action charge; and (4) a 2021 retail theft charge. Thus, the court found that defendant was engaged in criminal activity prior to the shooting and then continued to engage in criminal activity, even while on bond for the instant offense against Leeman.

¶ 53    Moreover, the circuit court also found that defendant's actions were not induced or highly influenced by Hernandez. Rather, the court found it important that, although defendant did not pull the trigger, Leeman and defendant were friends, and it was defendant who initiated contact with

29

Leeman to purchase cannabis on June 6, 2020. This arrangement allowed for this "tragedy," as the court referred to it, to unfold. Moreover, the court found it important that witness testimony indicated that Hernandez brandished his gun as soon as Leeman closed the bedroom door, which then led to defendant's immediate search of Leeman's drawers for money. As the court noted, it was defendant who left the home with Leeman's money. Again, although it is undisputed that defendant did not pull the trigger, defendant offered no aid to Leeman, which he admitted in his statement in allocution, after Hernandez shot Leeman in the head. Instead, defendant and Hernandez fled the scene on foot with Leeman's money on defendant's person. The evidence additionally revealed that defendant and Hernandez arranged for an individual to wait for them with a car to ensure their getaway, demonstrating a well-thought-out plan between defendant and Hernandez. Thus, the circuit court could not conclude that defendant's conduct was induced by someone else.

¶ 54    Next, defendant argues that the circuit court abused its discretion by improperly relying on Leeman's victim impact statement. Defendant maintains that the court heard a large amount of additional information about the offense in Leeman's statement. Defendant contends that the court not only failed to limit Leeman's statement but then relied on his statements when imposing defendant's sentence. Importantly, defense counsel objected to the admission of two victim impact statements, where defense counsel argued that the court could only consider one. As such, the court ruled that Leeman could make an oral statement at defendant's sentencing hearing and only one victim impact statement would be admitted. Moreover, defendant did not raise this specific claim before the court in his motion to reconsider. A defendant must raise claims of sentencing error by objecting at the sentencing hearing and in a motion to reconsider. *People v. McGuire*, 2016 IL App (1st) 133410, ¶ 12. If a defendant fails to take either of these steps, he forfeits claims

30

of sentencing error. *Id.* In that scenario, we may review claims of sentencing error only for plain error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Defendant forfeited his claim of sentencing error and did not argue plain error before this court. As such, this claim is forfeited.

¶ 55 Lastly, defendant argues that the circuit court erred by considering the harm caused to Leeman as an aggravating factor at sentencing because great bodily harm is a factor implicit in the offense of aggravated battery. According to defendant, consideration of the harm as an aggravating factor serves as an improper double enhancement.

¶ 56 It is well established that a factor inherent in the offense should not be considered as a factor in aggravation at sentencing. *People v. Conover*, 84 Ill. 2d 400, 404 (1981). However, a court may consider "the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant." (Internal quotation marks omitted.) *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986); *People v. Rennie*, 2014 IL App (3d) 130014, ¶ 29. The defendant bears the burden to affirmatively establish that the sentence was based on improper considerations, and we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improper. *People v. Bowman*, 357 Ill. App. 3d 290, 303-04 (2005). The question of whether the trial court relied on an improper factor at sentencing is a question of law that is reviewed *de novo*. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65. The weight given to any aggravating factor, however, is a matter of the trial court's sound discretion and will not be disturbed absent an abuse of discretion. *People v. Gooch*, 2014 IL App (5th) 120161, ¶ 11.

¶ 57 Because a wide range of conduct and harm could constitute aggravated battery, the circuit court was required to consider the extent of the harm and " the manner in which it was inflicted." *People v. Holman*, 2014 IL App (3d) 120905, ¶ 70. The court may properly consider the extent of the victim's injuries in sentencing where they exceed the required level for the element of great

31

bodily harm. *People v. Rader*, 272 Ill. App. 3d 796, 808 (1995). Our supreme court determined that "the commission of *any offense*, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm." (Emphasis added.) *Saldivar*, 113 Ill. 2d at 269. In fact, our supreme court stated further that "the *degree of harm* caused to the victim *** may be considered as an aggravating factor *** *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted*." (Emphases in original.) *Id.* As such, the degree of harm may be considered in sentencing a defendant for aggravated battery based on great bodily harm. See *id.*

¶ 58    On that basis, because the circuit court, here, determined that "defendant's conduct caused serious harm to [Leeman]," we presume the court determined the evidence demonstrated more than the harm inherent in the offense. As such, we interpret the circuit court's statement at sentencing to indicate that it considered the degree of harm caused to Leeman in fashioning defendant's sentence. The court considered the evidence presented at defendant's sentencing hearing, which included photographic evidence of Leeman's extensive head injury, which required a 13-hour brain operation to replace one-fifth of his skull. Aside from the extensive physical injuries Leeman experienced and continued to suffer from, the court also heard evidence of Leeman's psychological injuries following the shooting, which included PTSD, anxiety, depression, and dissociation. As such, the State presented evidence regarding Leeman's severe injury to his head, which has had a lasting impact on his physical and mental health. We, thus, conclude that defendant has failed to affirmatively establish, as is his burden, that the sentence was based on improper considerations. See *Etherton*, 2017 IL App (5th) 140427, ¶ 29 (we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improper). This is especially true where the court sentenced defendant to 23 years—a sentence 7 years below

32

the maximum sentencing range—and highlighted multiple aggravating factors, including defendant's criminal history, the fact that defendant was on bond when he committed additional criminal activity following the incident at issue, and evidence that defendant's actions ran counter to his mother's mitigation testimony that he had changed his life since the shooting. Thus, we find the court did not engage in improper double enhancement.

¶ 59    Accordingly, in our view, the factors considered by the trial court provided a sufficient basis for the 23-year prison sentence, which was within the statutory range of 6 to 30 years. Thus, under the facts and circumstances of this case, we do not find that defendant's sentence was excessive or that the court abused its discretion in sentencing defendant.

¶ 60                                     III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the circuit court of Williamson County denying defendant's motion to reconsider sentence.

¶ 62    Affirmed.

*People v. Travis*, 2026 IL App (5th) 240583

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Williamson County, No. 20-CF-278; the Hon. Michelle M. Schafer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Stephanie M. Glassberg, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Theodore Hampson, State's Attorney, of Marion (Patrick Delfino, Patrick D. Daly, and Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |